**CAPITOL PACKING COMPANY**

**v.**

**Richard Joyce SMITH and William J. Kirk, duly appointed, qualified and acting Trustees of the property of the New York, New Haven and Hartford Railroad Company, debtor in reorganization**

**and**

**Consolidated Packing Co., Inc.**

**and**

**Mt. Vernon Motor Transportation Co., Inc.**

**Richard Joyce SMITH and William J. Kirk, Trustees,**

**v.**

**The TRAVELERS INDEMNITY COMPANY.**

**Civ. A. No. 66–423.**

United States District Court
D. Massachusetts.

May 10, 1967.

Thomas E. Cargill, Jr., Cargill, Masterman, Redmond, Cahill, Boston, Mass., for plaintiff.

Mark Michelson, Will J. Bangs, Boston, Mass., for defendant Mt. Vernon Motor Transp. Co.

Edmund M. Sweeney, John A. Briggs, Boston, Mass., for defendants R. J. Smith and Wm. Kirk.

Harold Levine, Louis A. Zonderman, Boston, Mass., for Consolidated Packing Co., and Travelers Indem. Co.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW.

WYZANSKI, Chief Judge.

1. Capitol Packing Company, a Colorado corporation, filed a complaint against (1) Smith and Kirk, citizens of Connecticut and Massachusetts, who are trustees of the property of the New York, New Haven and Hartford Railroad Company, a debtor in reorganization, (2) Mt. Vernon Motor Transportation Co., Inc., a Massachusetts corporation, and (3) Consolidated Packing Co., Inc., another Massachusetts corporation. Thereafter Smith and Kirk, trustees as aforesaid, filed a third-party complaint against The Travelers Indemnity Company, a Connecticut corporation.

2. In the principal action Capitol claimed in count 1 that the trustees of the railroad are liable for the railroad's delivery of Capitol's goods covered by an order bill of lading without receipt of that bill, in count 2 that Mt. Vernon is li-

able for not having carefully guarded the goods, and in count 3 that Consolidated is liable for the beef which it bought and of which it received delivery. Subsequently Capitol amended its complaint so that count 1 alleged that the trustees of the railroad are liable under 49 U.S.C. § 20(11). In the third party action the railroad trustees complained that The Travelers Indemnity Company is liable on a bond for all sums that Capitol may recover from the railroad trustees.

3. October 14 or 15, 1965, Consolidated by telephone agreed to buy from Capitol 235 hind quarters of fresh beef. In accordance with their earlier dealings, the parties impliedly agreed that Capitol would ship the meat on an order-notify bill of lading; that Capitol, through appropriate banking channels, would transmit to Consolidated the original bill together with a draft for the purchase price drawn upon Consolidated; and that Consolidated would pay such draft. The parties expressly agreed that the meat would be shipped "piggy back", that is, not in a conventional closed freight car but in a trailer box transferrable from a trailer vehicle drawn by a truck to a railroad flat top freight car and thence to a trailer vehicle drawn by a truck. The parties impliedly agreed that Capitol would prepay the freight from its place of business to the Boston railroad ramp of the N. Y., N. H. & H. R. Co., and that upon arrival of the shipment in Boston the railroad would notify Consolidated. Consolidated expressly stated that it would use Mt. Vernon to pick up the shipment. Capitol had had no contract or understanding or relation of any kind with Mt. Vernon. Nor did Capitol ever expressly or impliedly agree that it would bear the cost of, or be concerned with, carriage from the Boston railroad ramp or terminal to Consolidated's platform or premises. It merely gave Consolidated a choice as to whether the beef would be delivered at the Boston railroad compound in a conventional freight car or in a trailer box transferrable from a railroad flat car to a truck.

4. October 20, 1965 Capitol shipped 235 fresh beef hinds having a value of $16,414.40 by delivering them to Curtis, Inc., a common carrier by motor vehicle, for it to carry the shipment from Denver to Chicago, and there to transfer it to the Erie-Lackawanna Railroad Company for carriage by it and the N. Y., N. H. & H. R. Co. from Chicago to Boston. Curtis, Inc., placed the 235 hinds in what is called "Curtis Box 907." To cover this shipment in Curtis Box 907, Capitol's agent and an agent acting for both Curtis and E.L.R. Co. executed an order-notify bill of lading upon a uniform domestic order of bill of lading form adopted by carriers in Official, Southern, Western and Illinois Classification territories.

5. On its face the bill recited that "The surrender of this Original ORDER Bill of Lading properly indorsed shall be required before the delivery of the property." That bill names Curtis, Inc. and Erie-Lackawanna as the receiving parties, and Capitol as shipper and as consignee. The bill then recites that the destination is "Boston", that the carrier is to "Notify Consolidated Packing Co."; that the "Route" is "CURTIS TO CHICAGO, EL NY NH–H TOFC PLAN 2–½ % MT. VERNON TRANS."; and that the freight is "to be prepaid."

6. The obverse of the bill sets forth in fine print certain contract terms and conditions. Here it is sufficient to refer to section 2(b) thereof which requires "As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier * * * within nine months after delivery of the property."

7. This Court finds as ultimate facts and concludes as a matter of law that—

(a) The destination "Boston" stated in the bill means the Boston railroad ramp of the N. Y., N. H. & H. R. Co.

(b) The route covered by the bill of lading is by Curtis, Inc. from Denver to Chicago and by Erie-Lackawanna and N. Y., N.H. & H.R. Co. from Chicago to Boston.

(c) The letters "TOFC" mean "trailer on freight car."

(d) "PLAN 2–½" means that the carriage covered by the bill of lading is that type of piggy-back transportation in which the railroad carriers perform only the carriage from one railroad ramp to another railroad ramp, and do not furnish either pick-up or delivery service, but such service is performed by some third party.

(e) % means "care of".

(f) In its entirety the bill of lading covers carriage only from Denver to the Boston railroad ramp of the N. Y., N. H. & H. R. Co. The reference to Mt. Vernon has no significance except to inform the N. Y., N. H. & H. R. Co. that after it has notified Consolidated of the arrival of the shipment, Consolidated's agent to pick-up the trailer box will be Mt. Vernon. See Commonwealth v. People's Express Co., 201 Mass. 564, 572, 88 N.E. 420.

(g) Under the bill of lading and under the agreement between Consolidated and Capitol, Mt. Vernon was to act not as a common carrier or as an agent for Capitol but solely as a contract carrier for Consolidated.

8. Capitol paid the freight from Denver to the Boston railroad ramp.

9. November 1, 1965 the beef shipment arrived at the Boston ramp of the N. Y., N. H. & H. R. Co. The railroad promptly notified Consolidated.

10. The same day Consolidated called Mt. Vernon and authorized it to act for Consolidated in picking up and accepting delivery of this beef shipment, which had been carried in "Curtis Box 907", and also another shipment carried in "Curtis Box 508."

11. Previously, Consolidated had arranged with the N. Y., N. H. & H. R. Co. and The Travelers Indemnity Company for the delivery to Consolidated of property covered by order bills of lading without the production of such bills. The original agreement was made August 13, 1962 and was renewed January 19, 1964. The 1962 agreement was set forth in a blanket bond, executed by Consolidated as principal and Travelers as surety, and naming as creditor or obligee the N.Y., N. H. & H. R. Co. The 1964 agreement took the form of a rider to the original bond. It continued the earlier bond but for a larger amount and for a longer period. Otherwise the agreement remained unchanged. The agreement contemplated that from time to time Consolidated would "request the Railroad to deliver shipments which are so consigned as to require * * * surrender of the original bill of lading * * * before delivery"; that Consolidated "will make requests only when" it "is the owner or is lawfully entitled to the possession of the property, and only when the covering bills of lading * * * are not immediately available"; and that Consolidated "will obtain and surrender the original order-notify bills of lading * * * on the 5th business day following the day of * * delivery of any shipment." To protect the railroad, Consolidated as principal and Travelers as surety warranted that the N. Y., N. H. & H. R. Co. would be indemnified from any liability for having delivered without an order bill of lading a shipment carried by the railroad under such a bill.

12. In accordance with the aforesaid agreement, bond, and rider, the N. Y., N. H. & H. R. Co. shortly after 6 A.M. on Tuesday, November 2, 1965 made delivery of the shipment of 235 hinds contained in Curtis Box 907 to Ernest R. Miller, a driver of a Mt. Vernon truck, acting as agent for Consolidated. At the time he accepted delivery, Miller did not have or surrender to the railroad the order-notify bill of lading covering those 235 hinds.

13. Miller trucked Curtis Box 907 to the side of a platform at 132 Newmarket Square. This platform ran in front of several adjoining places of business, called "bays", leased by different enterprises. At about 6:30 P.M. Miller deposited Box 907 at a place less than 50 feet from the entrance to the premises or bay leased by Consolidated, and as close as was then practical.

14. Almost simultaneously, Sampson, another Mt. Vernon employee who was not only a truck driver but also Miller's foreman, arrived at 132 Newmarket Square. He was trucking a shipment that came in "Curtis Box 508", pursuant to a sale and a bill of lading which are not relevant to this case.

15. At about 7 A.M., Sampson informed Harold Stone, who was the treasurer of Consolidated and authorized to act for it in connection with the receipt of merchandise, that "Both your trailers are here." Stone acknowledged this message by stating "That's good." Stone having acknowledged the presence of the trailer, in effect acknowledged the delivery of the contents of Box 907. It was not the expectation or agreement of Consolidated and Mt. Vernon that Mt. Vernon's drivers should remain with the box or help to unload it. Mt. Vernon's remaining obligation was merely to return the empty box to the Boston ramp or compound of the N. Y., N. H. & H. R. Co.

16. At about 3 P.M. Sampson asked Stone if the two boxes, Curtis 508 and 907, were empty. Stone replied that 508 was empty, that 907 was full, and that he was "going to knock it off later."

17. Stone, forgetting about Curtis 907, which remained loaded with beef in an unguarded place in front of the platform, left Consolidated's premises at 9 P.M. on November 2. During the night, Curtis 907 was taken, presumably by thieves. Since the putative larceny, the hinds have not been recovered.

18. Consolidated never paid the draft which Capitol made upon it, nor did it otherwise pay for the 235 hinds of beef. Capitol received back from its bank the order-notify bill of lading and has never received payment for the 235 hinds of beef. November 22, 1965 Capitol made written demand upon the N. Y., N. H. & H. R. Co. for $16,414.40, as the value of the shipment covered by the bill of lading. This demand was timely.

19. This Court finds as ultimate facts and concludes as matters of law that:

(a) When its driver picked up the beef at the Boston ramp, Mt. Vernon acted solely as a contract carrier selected by Consolidated as its agent. Mt. Vernon did not act as an agent for Capitol nor as a common carrier.

(b) When the N. Y., N. H. & H. R. Co. delivered the 235 hinds to Mt. Vernon, this constituted a delivery by Capitol to Consolidated of the 235 hinds sold by Capitol to Consolidated. The sale was then complete.

(c) Inasmuch as the Mt. Vernon driver did not have the relevant order bill of lading, the N. Y., N. H. & H. R. Co. did not have a right to deliver to him the 235 hinds of beef in Curtis Box 907.

(d) In delivering the beef without receiving simultaneously the bill of lading, the trustees of the New Haven became liable to Capitol, the party entitled to recover thereon, for the full loss and damage caused by the railroad. Here the full loss or damage was the price of the beef sold by Capitol to Consolidated, that is the $16,414.40 covered by Capitol's unpaid draft upon Consolidated, 49 U.S.C. § 20(11). For that loss or damage Capitol made timely demand. Capitol, therefore, is entitled to recover from Consolidated $16,414.40 with interest at 6% from November 2, 1965, the date the railroad delivered the beef to Consolidated's agent.

(e) Capitol's claim that it was damaged by the failure of Mt. Vernon to take due care of its beef is without merit. This claim fails both because the property in the goods passed to Consolidated when the railroad delivered the hinds to the Mt. Vernon driver and because Mt. Vernon exercised due care during the time it had possession of the beef. That possession ended when at 7 A.M. Stone on behalf of Consolidated acknowledged the delivery of beef to Consolidated. Such acknowledgment by Consolidated constituted delivery of the beef to it by its own agent, Mt. Vernon. See Calcot, Ltd. v. Isbrandtsen Company, 318 F.2d 669, 672 (1st Cir.).

(f) Consolidated authorized Mt. Vernon to pick-up the hinds. Mt. Vernon's action in taking Curtis Box 907 was an

acceptance by Consolidated of the delivery of the beef sold by Capitol to Consolidated. For beef sold and delivered Consolidated is liable to Capitol. The liability is for $16,414.40, the contract price, together with 6% interest from November 2, 1965, the date of delivery.

(g) The maximum amount recoverable by Capitol from both the claim against the railroad trustees and the claim against Consolidated is $16,414.40 with 6% interest from November 2, 1965. There being no third party action by the railroad trustees against Consolidated, it is unnecessary to go further than to indicate that as between them Consolidated is the party primarily liable.

(h) The trustees of the New Haven are entitled to recover from The Travelers Indemnity Company whatever amounts the trustees pay to Capitol pursuant to paragraph (d) above, less such sums as the trustees receive by way of reimbursement from Consolidated, as indicated in paragraph (g) above.

20. The foregoing findings of fact and conclusions of law can be summarized in three paragraphs.

(a) Capitol agreed to sell to Consolidated 235 hinds, Capitol to pay the freight from Denver to the Boston ramp of the N. Y., N. H. & H. R. Co., and Consolidated to use its own agent, Mt. Vernon as its contract carrier to pick up the shipment at the Boston ramp. Pursuant to the agreement, Capitol shipped the hinds on an order-notify bill of lading, under which the last common carrier was the N. Y., N. H. & H. R. Co. When the shipment reached its Boston ramp, the railroad notified Consolidated which sent to the Boston ramp its agent Mt. Vernon to accept delivery. The railroad made delivery to Consolidated's agent Mt. Vernon without receiving the order-notify bill of lading. Mt. Vernon in turn delivered the beef to its principal, Consolidated. Then the beef was stolen. Capitol has not been paid for the beef. It has the bill of lading.

(b) Consolidated as principal and The Travelers Indemnity Company as surety had executed a bond to the N. Y., N.H. & H. R. Co. as obligee agreeing to hold the railroad harmless for the railroad's liability for delivering shipments to Consolidated without surrender of the covering bills of lading.

(c) On the basis of these facts Consolidated is liable to Capitol for goods sold and delivered; the N. Y., N. H. & H. R. Co. trustees are liable to Capitol under 49 U.S.C. § 20(11); and the trustees are entitled to indemnification from Travelers. Mt. Vernon is not liable to Capitol.